The next argued case is No. 18, that's 1991, Auto-Drill, Inc. v. National Oilwell Varco. Mr. Henry. Good morning, Your Honors. David Henry on behalf of Auto-Drill. May it please the Court. In view of the evidence of record, in view of the clear and convincing evidentiary standard, which is required to be met if the claims at issue were to be found invalid on indefiniteness, we would respectfully argue that this case turns on two questions. With respect to two of the three elements that were found to be indefinite, the question is, does it remain the law that an algorithm for a computer-implemented 112F element can be stated in prose as opposed to code or some of the other forms? Again, in view of the evidence, that really boils down to the question here. The second question relating to the third element is, is it still the law that for a 112F element, an algorithm is only required when the corresponding function is to be carried out by a general-purpose computer and the corresponding function is not something that that general-purpose computer could carry out without special programming? Now, if we might turn to the first two elements in that context. Can I just make sure I understand this? Yes, Your Honor. There are three different terms that the District Court found indefinite. You have to get us to reverse on all three for you to prevail. If we affirm on any of them, the patent's invalid? That is correct, Your Honor. Okay. The first two elements are basically construed as the same. They are electronic bit-weight comparison means in Claim 1 and computer data and program processing means in Claim 3. Now, the District Court's ruling, we respectfully urge, can only be sustained if you essentially ignore virtually all of the evidence of record here. And my colleague at the Markman hearing at one point, we've cited this in our brief, said, well, experts are something like jukeboxes. You put in a coin and you hear the song you want. I think in that context, even if we take that as true, if we work on that premise, perhaps it's most persuasive to look at what their expert said, their expert that looked at the very same elements. Counselor, is it your position that the specification discloses an algorithm for the second step, generating a proportionate signal? Our position, Your Honor, is that there is an algorithm for the corresponding function of electronic bit-weight comparison. Generating a proportionate signal. Yes, Your Honor. Where is that? In the same sections recognized by all of the experts who have opined on this issue in the Ray patent, and this was quoted by their expert, Portia, at Appendix 6404-6406. And in turn, he quotes the 172 patent columns 539-44 and column 6, lines 6-19. And Mr. Portia says, in this quote, again, at Appendix 6404, I have reviewed the term electronic bit-weight comparison means, and he goes on to recite the corresponding function. And then toward the end of this quote, a possida would understand that a PLC with an algorithm that adjusts the output range of the PLC from a subtraction and goes on to recite the function here as disclosed in Ray. So he's saying an algorithm that does the corresponding function as disclosed in Ray and identifies the passages I just mentioned. Are you reading from 6404? Yes, Your Honor. Where are you, in the middle of that? In the quote by Mr. Portia. When he is, it begins, I have reviewed the term electronic bit-weight comparison means, and then he goes on again to recite it, and then says an algorithm, specifically says an algorithm as found in the Ray 172 patent and discloses column in line, column 539-44, 6, 6-19. So he says there's an algorithm. You know, this is their posida, this is their expert. As you see in our briefing, Mr. Stewart and Mr. Miller, our experts, auto drills experts, found and recited the same language. Now, there was a little bit of variance in the line quote, but they pointed to the same thing. Again, finding that there was an algorithm. Turning to the computer data and program. Let me get to where at least I have difficulty with your position. It seems to me that it could be argued that the specification does disclose in prose an algorithm for the first step, because it describes how the two weight values are to be compared, but not for the generating a proportionate single. I don't see, and you say that there's an algorithm, but show that to me. Where is that? In the 172 patent, in the passages, again, columns 539-44 and 6, 6-19. Column 5? I'm sorry. Column 5? Yes, Your Honor. And the other passages as well, 6, 6-19. What you'll see in there is Mr. Ray sets out. Where in column 5? What paragraph? Well, beginning lines, column line 39, Your Honor. Line 39. And through 44, and then again picking up 6, column 6, 6-19, are the passages cited by Mr. Portia. And in those sections, you will see that set out are numerical ranges that are compared, that are processed, that talk about this proportional signal that is generated, that goes out to generate the breaking signal. And so it is a very simple process. You have a user set point, what you want. You're reading what comes in. And out of that, you have a signal that controls the break until those match up, in essence. What does it say how it does that? I mean, to me, all you're saying is really broad functional language redescribing the function, which isn't sufficient when you have a means plus function. Well, Your Honor, if we had said, for example, and this would be along the lines of aristocrat, merely reciting the function, of course, is prohibited functional language. If we had said calculate a signal for the correct break pressure, well, that certainly would be merely functional language. But instead, we say you take this information in, what the user is determining the desired weight on bit, you compare it with what the measured from the sensor, what the actual weight on bit is, and you generate a signal that tells the, essentially, the break to go up or down to zero in on that. And those are functions. How does that happen? How do you generate a signal that tells the break to go up and down or that slow down or to go up or to speed up? Well, that has to do with the parameters discussed by Ray in the patent when it talks about the output signals. Where in the patent? In the columns and lines I recited. I don't see it, sir. You're going to have to be more specific. What formula is used to generate that signal and where is it? Well, we don't have a formula in there. I mean, there are computations recited in the patent, but in terms of the formula, this is a process, a very simple. It doesn't matter how simple it is. The fact that a skilled artisan can look at this and say, anybody can figure out any number of different ways to do that, isn't enough when it's a means plus function claim. If it's a means plus function claim, you have to actually put in specific structure, in this case algorithms that explain the formula you use. You can't rely on functional language and say, this is simple. People can do it. Isn't that our case law? Yes, Your Honor. But we would argue that because of the simplicity of this, what is the user input, what is the signal we want, and you're dealing with a computer known in the art to achieve the end result sending out this break control signal, and that is precisely what Mr. Portia, their expert, as well as ours as well, found. It's like we see here is an algorithm. This would achieve this function. They admit that on the record. Their own expert came to that conclusion, and as did ours. Again, we did not say, nowhere does the claim say or the corresponding function in the specification say, figure this out. On what basis? At the end of the day, the Court disagreed, and that's what we're reviewing. We're reviewing the Court's judgment. Yes, Your Honor. And in a clear and convincing, I can't emphasize this enough, in a clear and convincing evidentiary standard, how can we say respectfully that clear and convincing evidence is to the effect that there is no algorithm when every single expert. You can't point to it. Where is it? Well, it's the language we just talked about. It describes. You take the input signal from the sensor. You take the user input. You generate the signal and send it out to the brake control. And this is something that these PLCs, and this is also in the record, these PLCs, they're able to do that. And so, no, we don't have computer code. We don't have flow charts, but our understanding of the law of this Court. That's what I wanted to ask you, because I've long been troubled by, in fact, how much code or whatever needs to be included. What, in your view, would have been, and it does look as if based on how our case law has evolved, this is perhaps colorable compliance. What would have been, from the viewpoint of the technology, the next step in disclosure? Is it the code or the actual code, or is there some intermediate path that might provide more information to fulfill the purpose of patents, which is to teach the technology that you have developed? Your Honor, I believe, and this is consistent with the testimony that we've quoted in the record, that the next step would have been simply to translate what was described and what was recognized, including by their expert as an algorithm, into code. For this PLC, which, again, is an industry-used computer, somewhat special purpose, but still programmable, code would be the next step, Your Honor, we would argue. That's my sense. I have to tell you that's my sense. But the code has long ago been set aside as something that a capable programmer, it might take a long time, it might take quite a team of programmers, but it's straightforward. There's no invention in it. It's just filling out the code. But somehow, without that, it does seem inordinately generalized. Well, Your Honor, if the... Here's the question I have. Yes, Your Honor. You have the comparison stuff. That seems fairly simple. There's a number, you compare it to another number. Yes, Your Honor. But what do you do with that comparison to generate a signal? Well, if the basically, and this is very straightforward, I guess that's why this seems so simple, but if the... It may seem simple to you. It doesn't seem simple to me. And I don't see anything in that language that tells me how you get from the comparison to the signal. Well, the signal, Your Honor, goes to... What steps do you take to generate the signal based on the comparison? Well, it's, at least in this context, relatively simple. You have a set point. You keep saying that. Okay. Quit saying it's simple and just tell me what the steps are. Okay. The steps are, the user inputs, I want 10,000 pounds weight-on-bit pressure. The sensor reads that it's 12,000 pounds. Then the PLC sends a signal out that says, Reduce the weight-on-bit until it reaches 10,000. If, on the other hand, the measured is 8,000, send out a signal that takes it back up to 10. It's a very simple, Are we too high? Are we too low? Is that in this claim? Or, I know it's simple, but is it in the claim? It sounds like you could have done a simple flow chart that says, If low, increase pressure. If high, decrease pressure. But I didn't see that in the claim language, or in the specification. Where does it say those exact steps? Well, when it describes, in the language quoted, that we've quoted before, the columns quoted by Mr. Portia, it describes exactly that. And we go on to, Where does it say if the pressure is too high, lower it, and if the pressure is too low, raise it? That has to do with the language where the numeral, the output signal for the braking control, I believe it's like 50, 40. Your Honor, I apologize, but my copy of my patent did not get in here. I sincerely apologize. Thank you, Your Honor. Okay, thank you so much. Counsel, you don't have a copy of your patent? It didn't come out through the printing service. I sincerely apologize, Your Honor. You know, this happens over and over again. This is the second time that happened to me this week, that attorneys don't bring the record with them so that they can answer questions. You've been here before. I don't understand why you don't have the whole record in front of you so you can answer our questions. I apologize, Your Honor. It's column 6, beginning at lines 28. And here we talk about the examples just as I gave or analogous to what I gave, and it talks about the output, this 4095 output signal. And then it goes on to describe, again, more or less along the lines I was just describing. If the weight is too high, you send a signal to correct it. If it's too low, you send a signal to correct it. And this 4095 is an understood method of signals in this context. So it is in that language. And actually, even before that, if you look at column 6, line 20, the precise management of RPM of electric motor 82, and it goes on to describe the set points and the signal out. And we're describing what people in the art understood to be. I'm sorry, the algorithm. I have not gotten to my second signal input means. Perhaps I should. Well, you can look for it and bring it forward in your rebuttal. Let's hear it from the other side. Okay, thank you, Your Honor. Thank you. Mr. Manning. May it please the Court, Your Honors. Could you go right to what he just showed us on column 6? I guess lines roughly 28 to 40, where he's talking about these different numbers and stuff. Yes, Your Honor. It sounds to me that that's just an example of how this can operate. It's not actually an algorithm, but why isn't that enough of a suggestion that all you do is compare these numbers and go up or down? Yes, Your Honor. If I may give you an example. In Houston, we hate traffic, and we always joke around, we need a car that can fly over traffic. So if you take a car and you want a patent on it and you say, well, we are going to program this car to fly from 10 feet to 100 feet, and it's going to get us all the way to work. And we go try to get a patent on it. You can't get a patent on that. And the reason you can't get a patent on that is because you haven't possessed an invention. You actually haven't designed something. You can't describe something you want achieved in the real world and have that satisfied. I get that, and it sounds like you have that example in your pocket. What I really want to know is, specifically, these lines in column six, why that that's not a sufficient algorithm. If it really is this simple of an invention to say, compare the two numbers, and if it's too high, adjust down. If it's too low, adjust up. Maybe that's what this says. I'm not sure that I read it as saying that or am confident to read it to say that. But specifically, can you respond to his point on that? Yes, Your Honor. If you go up a little bit on column six, if you go to column six, line 22-23, it talks about how these certain functionalities they want to achieve will be products of the software or firmware they're using. Sure, I get it. He pointed us to that. That clearly is not enough. That's just complete functional claiming we have software that's going to do the desired result without actually putting in an algorithm for the software or some kind of flowchart. That's not good enough. But again, following that is a specific example of how that software might work. Is it not? No, it is not, Your Honor. Here, in the context of an automatic driller, the signal from 0 to 495 that they're talking about, they don't define that signal, and they don't tell us how to get to that signal. In an automatic driller, you're going to have a 4-20 milliamp signal, and a milliamp signal is going to be a tiny, tiny, little bitty signal. And in the end of the system, you have to have a signal that's strong enough in power to turn an electric motor to get it working. And we have no idea how this tiny, tiny, little bitty milliamp signal gets to here. And saying, describing something happening in the field, an automatic driller is drilling at this rate and changes to this rate and changes to this rate, that doesn't tell us, give us the step-by-step way to do it on a computer. That's one thing. And then another thing, Your Honor, if you're not supposed to, and that's the medical instrumentation case, you're not supposed to take the knowledge of a posita and try to figure it out. But if you want to take that step and look at this just to get it in context, their automatic driller claims, both their claims, require that it be capable of going both up and down, pulling the drill stem up and down. And in this particular portion, all they're talking about is pulling the brake. So not only is it not a sufficient example to tell us how to do it on a computer, if we were to try to use our expertise, our posita knowledge, and try to discern what the heck it means, it is only half the story. Thank you. Really raising the question, I wonder, was there an issue of claim breadth during this litigation, or was it entirely the points we're discussing here? Your Honor, we went through a comprehensive Martman hearing and construed, don't quote me on this, I think eight or nine different terms, but only the indefinite terms are part of this appeal. Did I answer your question correctly? Well, it answers the question I asked you. The question which comes to mind is in fact the broader question that if having computerized a system that was in the past done manually and through experience and instinct and all of the other decades and generations that have gone into these procedures, and now we have the computer that automatically tells us when the bit's too heavy and tells us some other things that were previously discerned by experience. It seems to me that on the one hand, this is a significant contribution, but on the other hand, how broad is one fairly entitled to claim the breadth of the contribution? And in looking at it, those thoughts kept arising. It looked to me as if it is a broad statement of, let's do by computer what we've been doing for centuries. At the same time, that's not easy to do. We know it's not easy. It also comes clearly through that there were significant contributions of expertise. Where can we draw a reasonable and fair line? Because it does seem as if they've made an important contribution. Yes, Your Honor, and there was a big Supreme Court case on this. I cannot think of it off the top of my head, but things have been done mechanically for so many years. And when the computer technology revolution hit, all these people came in and said, hey, we want to patent them. The way it used to be done mechanically, we want to now do it computer. And we want to patent on it that way we'll use the means language. And that's sort of where this algorithm requirement came out. And it's a very strict one because it's too easy to say, I want to take what's been done and I just want to add a computer element to it. That's too easy to do. You don't deserve patent protection. The reason of 112 is to show you possess an invention. You actually came up with it. So when it comes to the algorithm requirement, you have to be able to read. You have to have a step-by-step guide on how to achieve. What they want done on a computer, you have to be able to achieve that on a computer. You can't describe functional language. But it doesn't have to be code, right? It can be prose. It can be prose, Your Honor. It can definitely be prose. It can be flow charts. It can be mathematical formula. But that prose has to be pretty dang specific. It needs to get us from the beginning to the end and have step-by-step way where we can sit down on a computer and design it. And you guys and gals are well familiar that that is the tradeoff for getting a patent. You have to tell everyone else what you've discovered. And here it's very obvious that they did not have a way to get this done on a computer. So they sort of used this functional language of what they wanted to achieve. And that's not sufficient under the law. They say what they want to achieve. I do have trouble finding some intermediate prose description short of code. I agree with you, Your Honor. The prose, the NOAA systems case says you can use prose, but there is very little case law out there that's found prose is sufficient. And if it is, if I were writing the patent, my prose would be in the form of an executable computer program. I would include the actual program we were using. You would have written it the same way, right? Yes, Your Honor. Except you would have put code in it. Yes, Your Honor. Well, code with written prose English language, it would be written out in the code itself. You don't have to write the code. If you put every single step that the computer is going to perform in prose, that's a sufficient algorithm. Your Honor, I think that would be sufficient. But, Your Honor, I think in this case we just have the functional language like we talked about, so I don't think they're going to get there. One point I really wanted to hit home that our opposing counsel made during his is he said that the experts agree with him, and I disagree with his assertion. I think all the experts agreed with us. And if you look at page 18 on our brief, we go through the details. Your Honor, 18 of our brief, the first two paragraphs that are indented in, that is actually their expert, Michael Stewart, and he specifically said he would not be able to look at this and see an algorithm. He would have to hire someone to develop it for him. So page 18 says readily obtained in the field? Yes, Your Honor, where that's underlined. Here he's saying I can't read this and figure out from these pages. I would have to use my knowledge readily obtained in the field. And then if you read the next paragraph from their expert, he says to actually get this invention to work, I would have to develop an algorithm to perform the release of drill string. Program, person of person, program is you just go out and hire a programmer. What was, where is the inventive step? Exactly, Your Honor. They're experts saying we don't have anything here what we need. We have to go out and hire someone to actually develop the algorithm to perform this thing. It was just an ordinary programmer. It has been the culture of the way this jurisprudence has developed. You describe in prose some complex, performing some complex function. You turn it over to the programmers who then carry it out. Well, Your Honor. Not just in this patent, but in hundreds or thousands now are written the same way. Well, Your Honor, the way that I read the testimony is that he, as the person of ordinary skill in the art, should at least be able to develop the beginning portions of a program or at least a working understanding of how to get from, as we talked about, the 4 to 20 milliamp signal all the way over here to the power signal and figure out a way to drive the bed up and down. And none of those details are there. He's saying he would have to hire someone to sort of fill in the blanks and do those details. That's long been the law, that you can hire someone to conduct routine operations or even to conduct non-routine operations at your instruction as to this is where we want to go. Yes, Your Honor. But with what's in this patent right here, there's not sufficient enough basis to provide those instructions to someone for them to be able to design an algorithm. I know. To say if you've got too much weight on the bed, reduce it. What more do you need? Well, the programmer may be able to come up with a program, Your Honor, but that was never included. That was never done for this patent. And the program that the programmer may come up with, that was never included in this patent. Well, if that's not a step that's included in the claim, then it doesn't have to be. The claims do require that these computer implemented means plus functions terms, they have to be required to raise and lower the drill bit. I don't know. This is a larger problem, perhaps, in this case. But I still don't know the dividing line between a pros description, such as here, reduce the weight, and providing several million or billion ones and zeros. Your Honor, I would respectfully suggest that reduce the weight and drive the drill stem up and down. Those are what you call wish list objectives. That's what I would like this invention to achieve. That's the functional language that we know does not satisfy an algorithm. Now, if we take it a step back further and the pros you're interested in, if you want pros sufficient enough to raise and lower the drill stem, you should have examples of we need to start with this 4 to 20 milliamp signal. This signal needs to come into a certain type of computer program. The program uses a certain type of operating system. That operating system knows to do the subtraction. From there, it needs to receive this input, that output, and based on what thread at that point, it will turn it to voltage. After it's turned to voltage, it can then go through a VFD, which then turns it to power. Are you now going to run that in a loop? Are you doing it in an isolated instance? But the pros would need to be so specific that a person could sit down and write the actual computer program to do it. But as you know, that hasn't been the law. Just draw a few boxes, string them together with a line, and there's your entire description of the computerized system. I'm troubled by that. At the same time, isn't that where we are, as far as the law of how specifications are written? Your Honor, the NOAA case does allow block diagrams. It allows an algorithm requirement to be satisfied by computer code, block diagrams, and also pros. It seems to me that the way our law has coped with it, and perhaps in this case as well, is to say just do by computer. What we've all been doing by hand or by some other system is not enough, and that criticism perhaps can be made here. I didn't see it made. Well, yes, Your Honor. Here we don't even have the simple block diagram, so I don't think that portion of the law. I say I'm out of time. Do you all mind if I keep going to answer the question? Let's continue the thought. If there's something else you need to tell us. Yes, Your Honor. Well, the RAVE 172 patent, it doesn't even have the block diagram. We don't even have a simple breakout of how to get from the beginning of this thing to the end of this thing. I wanted to say something briefly about the signal input means. If the court wants to hear about that term, but if the court does not, I will sit down. Are you okay? We're okay. Thank you. Mr. Henry. Thank you, Your Honor. Regarding the experts agreeing or disagreeing with us, I would like to just point you briefly our reference, page 34 through 36 of our appellate's brief. There, Mr. Stewart, that my colleague quoted, explained where he used algorithm in two different ways. One to refer to the logic set out in the patent itself. The other, when he talks about developing an algorithm, that's the code. We clarified this summarizing on page 36 of our brief where he explains, this was in a deposition, explains, no, I was using the term in two different ways, but the logic of what has to happen, that is in there and they clarified that there. Now, on signal input means, very briefly, we would respectfully urge that the district court essentially read an element out of the claim in finding that signal input means was merely preferable. We would argue that the district court exchanged preferred embodiment with preferred to be there at all. Now, in column five of the patent. Did you make this argument in your brief? Pardon me? Did you make this argument in your brief? Yes, Your Honor. That essentially the element, it's the part where we discussed that the way the court construed signal input means, it would basically mean a PLC comprising a PLC. And that essentially reads that element out by saying that it has to be a separate PLC, a computer requiring an algorithm. So if you look at the actual description in column five, appendix 144, of the 172 patent, lines 25 through 35, here we describe that you have an analog-digital converter. We even give an example. I mean, I think you have a good argument on this issue, but even if we agree with you, you have to get us to agree with you on the other two as well, right? Yes, Your Honor. Yes, Your Honor. And on that point. It would seem much harder for you. Thank you, Your Honor. On that point, back to the first two elements. Yes, we have pros. Yes, it is simplistic. Your Honor, Judge Newman, you asked about if all we're doing is doing by computer, that's which has been done forever. If that was the only thing in these claims, then frankly, we would have Alice issues. But it's not. We have a computer taking in sensitive sensor data. We have the computer sending out data to a responsive non-pneumatic motor. These are all elements of those claims, so it's the integration. Certainly, computer is part of it, but it's the integration of these features. Yes, the calculation is what's been done manually for a long time, but you put it all together, and what you have is an incredibly responsive auto-drill system that advanced the art tremendously. The fact that the computer element of it is very simple, that does reflect what was done before very simply. If it's too high, send out a signal to reduce it. If it's too low, send out a signal to raise it. We showed the examples in the specification of at least samples of that, but it's the combination, so it's not just doing that by computer,  There was a tremendous contribution to the art. So, Your Honor, we would urge that, simple as it is, the law allows us to, in prose, say, do this, then do this, then do this, and we did that. We don't have code, admittedly, so there's an algorithm there, and I would respectfully remind the Court, of course you know this, clear and convincing evidence. When we have experts, when we have all experts, including theirs, saying, I see an algorithm. Here is where it is. This carries out that function. In fact, Mr. Porsche actually used the term structure. I find that this is what carries out that function. How can we have clear and convincing evidence of invalidity in the face of that, when you look at it at that evidentiary level? So we respectfully urge, Your Honor, that you reverse the lower court's finding as to indefiniteness of all three elements and remand this for further proceedings. Thank you. Thank you, Your Honor. The case is taken under submission, and that concludes our arguments for this morning.